**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

In re:

JMK CONSTRUCTION GROUP, LTD.,

Debtor.

Chapter 11
Case No. 10-13968 (MG)

JOEL SHAFFERMAN, THE LIQUIDATING TRUSTEE
OF JMK CONSTRUCTION GROUP, LTD.

Plaintiff,

v.

THE QUEENS BOROUGH PUBLIC LIBRARY,

Defendant.

Adversary Proceeding
No. 13-01105(MG)

THE QUEENS BOROUGH PUBLIC LIBRARY,

Counterclaim/Third-Party
Plaintiff,

v.

JOEL SHAFFERMAN, THE LIQUIDATING TRUSTEE
OF JMK CONSTRUCTION GROUP, LTD.,

Counterclaim Defendant,

- and -

JACOB M. KOPF,

Third-Party Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING KOPF'S MOTION TO**
**DISMISS THIRD-PARTY COMPLAINT**

1

*A P P E A R A N C E S:*

SHAFFERMAN & FELDMAN, LLP
*Counsel for the Liquidating Trustee*
18 East 41st Street
New York, NY 10017
By:    Joel Shafferman, Esq.

THOMPSON HINE LLP
*Counsel for the Queens Borough Public Library*
335 Madison Avenue
12th Floor
New York, NY 10017
By:    Barry M. Kazan, Esq.
        Rebecca Brazzano, Esq.

DUANE MORRIS
*Counsel for Third-Party Defendant Jacob M. Kopf*
1540 Broadway
New York, NY 10036
By:    James J. Vincequerra, Esq.
        Charles Fastenberg, Esq.
        Vincent J. Nolan III, Esq.


**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Jacob M. Kopf's ("Kopf") *Motion to Dismiss Plaintiff's*

*Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)* (the "Motion," Adv. Pro. No. 13-01105, ECF

Doc. # 17).[1]  Kopf was the president and sole shareholder of JMK Construction Group, Ltd.

("JMK"), the chapter 11 debtor in Bankruptcy Case No. 10-13968.  Through the Motion, Kopf

seeks dismissal, under Federal Rule of Civil Procedure 12(b)(6), of the claims asserted against

him as third-party defendant in the *Answer of Queens Borough Public Library, Counter-Claims*

*Against Joel Shafferman, the Liquidating Trustee of JMK Construction Group, Ltd. and Third-*

*Party Complaint Against Jacob M. Kopf* (the "Third-Party Complaint," ECF Doc. # 8), filed by

The Queens Borough Public Library ("QBPL" or the "Library").  QBPL filed an opposition to

---

[1]        Unless otherwise noted, all references to the docket are to Adv. Pro. No. 13-01105.

the Motion (the "Opposition," ECF Doc. # 25).  Kopf filed the *Surreply in Support of Jacob M. Kopf's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)* (the "Reply," ECF Doc. # 27).  The Court held a hearing on October 29, 2013.

For the reasons that follow, the Court **GRANTS** the Motion.  All of the Third-Party Claims (defined below) are **DISMISSED** without prejudice, and QBPL is granted leave to amend.

## I.  BACKGROUND[2]

### A.  QBPL and JMK/Kopf

Beginning in 2006, QBPL and JMK entered into a series of contracts (collectively, the "Contracts") for the provision of services related to certain Library construction projects (the "Library Projects").  (Third-Party Compl. ¶¶ 18–55.)  Although three distinct types of contracts collectively composed the Contracts at issue in this case, JMK's duties under each type of Contract were generally similar.  (*See id.* ¶¶ 30–55.)  Each Contract required JMK to supervise the quality and ensure completion of the subcontractors' work, and provide the Library with signed representations of the quality and progress of the subcontractors' work.[3]  (*Id.* ¶¶ 30–43.)  The Library relied on JMK's representations in issuing payment for work purportedly performed by the subcontractors.  (*Id.* ¶¶ 61, 71–73, 137–140.)

The Contracts differed primarily in their payment structures.  Under one set of contracts (the "Master Agreement Contracts"), JMK contracted directly with the subcontractors and received a flat fee plus a percentage of the amounts paid to the subcontractors.  (*Id.* ¶¶ 34, 41.)  Under another set of contracts (the "Stand Alone Contracts"), JMK contracted directly with the

---

[2]　　Most of the facts come from the Third-Party Complaint and are taken as true when considering a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3]　　There are no allegations in the Third-Party Complaint that Kopf signed any written representations regarding the quality and progress of the subcontractors.

subcontractors and was paid a flat fee.  (*Id*. ¶¶ 47–48.)  Under the last type of contract (the "Pass-Through Contracts"), the subcontractors contracted directly with the Library, and JMK was paid a percentage of the total construction cost.  (*Id*. ¶¶ 51–55.)

### B.  Bankruptcy Case and Adversary Proceeding

On December 10, 2007, Air China Limited ("Air China") filed a lawsuit against several defendants including JMK and Kopf, asserting various claims, including conversion and unjust enrichment.  (*Id*. ¶ 78.)  On or around July 14, 2010, a jury found JMK and Kopf liable for conversion and unjust enrichment, finding in particular that Kopf had unjustly enriched himself by more than $180,000 and had wrongfully converted $364,000 (the "Air China Judgment").  (*Id*. ¶ 79.)  The total award rendered against JMK and Kopf amounted to $1,473,406.89, including $750,000 in punitive damages and $177,406.89 in pre-judgment interest.  (*Id*.)  On July 23, 2010 (the "Petition Date"), JMK filed a voluntary petition for protection under chapter 11 of the Bankruptcy Code, commencing Bankruptcy Case No. 10-13968.[4]

On October 23, 2012, this Court entered an Order (the "Confirmation Order," ECF No. 10-13968 Doc. # 213) confirming the *Debtor's Second Amended Chapter 11 Plan of Liquidation* (the "Plan," ECF No. 10-13968 Doc. # 185).  In return for certain payments by Kopf to fund the Plan, the Plan included a release of the estate's claims against Kopf; any claims Kopf might have against JMK were discharged.  QBPL did not object to the Plan or to the release of the estate's claims against Kopf.[5]

---

[4]    On September 14, 2010, Kopf filed a personal chapter 11 bankruptcy case.  (ECF No. 10-14847, Doc. # 1.)  Kopf also appealed the Air China Judgment.  The bankruptcy automatic stay initially prevented Air China from executing on the judgment.  After Kopf successfully raised the money for an appeal bond, he voluntarily dismissed his chapter 11 case on October 25, 2011.  (ECF No. 10-14847, Doc. # 109.)  QBPL never filed a claim in Kopf's individual bankruptcy case.  (Motion at 3 n.1.)

[5]    Kopf contributed money to the Plan in exchange for a release of any and all derivative claims held by or on behalf of JMK and its estate.  (*See* Plan Art. 10.3; Confirmation Order ¶ G.)  That release does not apply to any direct claims held by QBPL; only derivative claims held by or on behalf of the estate were released.  QBPL, a creditor of the estate, participated in the plan confirmation process and never filed an objection to the Plan.

On January 4, 2012, QBPL filed a proof of claim in the case "asserting an undetermined amount of damages, including, but not limited to, the mitigation damages incurred attempting to finish the projects that Debtor failed or otherwise refused to complete, or completed in an unprofessional and non-workmanlike manner or had abandoned altogether."[6]  (Third-Party Compl. ¶ 99.)

A trust was created pursuant to the confirmed Plan, and Joel Shafferman (who had been counsel to the Creditors' Committee) was appointed as the liquidating trustee (the "Liquidating Trustee").  The Liquidating Trustee filed this Adversary Proceeding against QBPL on January 24, 2013.  (*See* Adversary Complaint, ECF Doc. # 1.)  The Liquidating Trustee seeks a judgment against QBPL in an amount not less than $395,000 for payments allegedly owed to JMK under the Contracts, and for the turnover of trust fund money.  The claims against QBPL include breach of contract and unjust enrichment.

---

[6]       The Debtor objected to QBPL's claim, but because of the claims and counterclaims asserted in the Adversary Complaint and in the Third-Party Complaint, the Liquidating Trustee and QBPL agreed that all of the issues would be addressed in the adversary proceeding; therefore, the claim objection was withdrawn.  The claims and counterclaims between the Liquidation Trustee and QBPL necessarily will be resolved as part of the claims-allowance process.  Therefore, the Court has constitutional authority to enter final orders and judgment resolving all of the disputes between the Liquidation Trustee and QBPL; QBPL's consent to the entry of judgment on those matters is unnecessary.

QBPL alleges in paragraph 15 of the Third-Party Complaint that the "Court does not have authority to exercise jurisdiction over Kopf and the third-party claims against Kopf under the Supreme Court's ruling in *Stern v. Marshall.*"  Paragraph 16 states that "QBPL does not consent to entry of a judgment on the QBPL Complaint."  QBPL is wrong to the extent that it argues that the Court does not have jurisdiction over QBPL's third-party claims against Kopf.  Related-to jurisdiction does not appear to exist over the post-confirmation Third-Party Complaint against Kopf under 28 U.S.C. § 1334; the third-party claims should not have a conceivable effect on the estate since Kopf's claims against JMK are discharged.  But the Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367 (supplying jurisdiction "over all other claims in the action within such original jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy").  While not free from doubt, there is authority, including in the Second Circuit, that bankruptcy courts may exercise supplemental jurisdiction.  *See, e.g., In re Pegasus Gold Corp.*, 394 F.3d 1189, 1195 (9th Cir. 2005); *Lionel Corp. v. Civale & Trovato, Inc. (In re Lionel Corp.)*, 29 F.3d 88, 92 (2d Cir. 1994).  Jurisdiction over the third-party claims, however, does not necessarily mean that the bankruptcy court may enter final orders or judgment with respect to the claims.  The Court need not address the issue now since the order granting the Motion is an interlocutory order.  *See O'Toole v. McTaggart (In re Trinsum Group, Inc.),* 467 B.R. 734, 739–42 (Bankr. S.D.N.Y. 2012).

### C. The Third-Party Complaint

The Library filed an answer that included counterclaims against Shafferman (in his capacity as Trustee of the Liquidating Trust) and the third-party claims against Kopf.  In its answer, QBPL asserts the following causes of action against the Liquidating Trustee and JMK: breach of contract (Counts I–III); negligent performance of contract (Count IV); conversion (Count V); fraud (Count VII); and unjust enrichment (Count VIII).  In addition, QBPL asserts the following counts directly against Kopf as third-party defendant:  conversion (Count VI); unjust enrichment (Count IX); and for declaratory judgment that Kopf is liable for the debts of JMK under theories of alter ego liability (Count X) and piercing the corporate veil (Count XI) (collectively, the "Third-Party Claims").  The Liquidating Trustee filed an answer to the counterclaims.  Kopf moved to dismiss the Third-Party Claims.

## II.  DISCUSSION

The issues raised in the Motion require the court to evaluate the sufficiency of the four claims against Kopf as third-party defendant.  For each of the Third-Party Claims, the Court must first determine whether QBPL has standing to bring the claim.  If this question is answered in the affirmative—and only then—the Court must determine whether the claim is sufficiently pled to survive a motion to dismiss.  In undertaking this two part analysis, the Court will address the Third-Party Claims in pairs, first discussing the veil-piercing and alter ego claims, followed by the conversion and unjust enrichment claims.

### A. QBPL's Veil-Piercing and Alter Ego Claims

#### 1. *Standing*

Before deciding whether the Third-Party Claims state plausible claims for relief, the

Court must consider whether QBPL has standing to bring the claims, or whether the claims

against Kopf belonged to the Debtor's estate and were released under the Plan. "To determine

standing, the Court must look to the underlying wrongs as pleaded in the complaint and whether

the plaintiff alleges a particularized injury." *McHale v. Alvarez (In re 1031 Tax Grp., LLC)*, 397

B.R. 670, 679 (Bankr. S.D.N.Y. 2008) (citations omitted).

##### a. Creditors May Only Bring Claims Alleging Direct, Particularized Harm

"If the cause of action belongs to the estate, the trustee has exclusive standing to assert it;

conversely, if the cause of action belongs solely to the . . . creditors, the trustee has no standing

to assert it." *In re Granite Partners, L.P.*, 194 B.R. 318, 324–25 (Bankr. S.D.N.Y. 1996); *see

also Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 96 (S.D.N.Y. 2011), *aff'd*, 721 F.3d 54 (2d

Cir. 2013) (stating that "the Trustee only has standing to pursue claims of the Debtor."). "When

the trustee has standing to sue, the automatic stay prevents creditors or shareholders from

asserting the claim notwithstanding that outside of bankruptcy, they have a right to do so."

*Granite Partners*, 194 B.R. at 325. Because the Court has already confirmed a Plan, it is the

plan injunction and release—not the automatic stay—that bars creditors from bringing suits that

are derivative and belong to the estate. (*See* Plan Art. 10.1) To determine which claims are

derivative and belong to the estate, and which claims are direct and belong to creditors, the Court

looks to state law. *1031 Tax Grp.*, 397 B.R. at 679; *see also Koch Refining v. Farmers Union

Cent. Exch., Inc.*, 831 F.2d 1339, 1344–50 (7th Cir. 1987) (analyzing state law to determine

7

whether claims were property of the estate).  JMK was incorporated in New York; the parties

agree that New York law governs.

      b.  <u>QBPL Has Standing to Bring the Veil-Piercing and Alter Ego Claims to the</u>
<u>Extent They Allege Direct, Particularized Harm</u>

In Counts X and XI, QBPL seeks a declaratory judgment that Kopf is liable for the debts

of JMK under theories of alter ego liability and piercing the corporate veil.  In New York, these

two theories are evaluated together; alter ego liability is one basis for piercing the corporate veil.

*See, e.g., Gosconcert v. Hillyer,* 158 B.R. 24, 28 (S.D.N.Y. 1993).  "[P]iercing the corporate veil

does not constitute an independent cause of action . . . . Instead, the alter ego doctrine is a theory

of liability generally invoked to disregard the corporate entity to find the owners liable for the

debts of the corporation."  *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors,*

*Inc.*, 871 F. Supp. 2d 103, 124 (E.D.N.Y. 2012) (internal quotation marks and citations omitted).

"A creditor has standing to bring an alter-ego claim when the harm alleged in support of

the claim is personal to them; a creditor lacks standing to bring such a claim when the harm

alleged is general."  *In re Cabrini Med. Ctr.*, 489 B.R. 7, 17 (S.D.N.Y. 2012) (citation omitted).

Conversely, a bankruptcy trustee only has standing to bring an alter ego claim when the claim is

brought on behalf of the debtor corporation.  *See Picard*, 460 B.R. at 96–97 ("We do not

question the right of a trustee in bankruptcy to maintain a 'veil piercing' suit on behalf of the

bankrupt corporation, but the qualification 'on behalf' must be stressed." (quoting *Steinberg v.*

*Buczynski*, 40 F.3d 890, 892–93 (7th Cir. 1994))).

"In assessing whether the 'action accrues individually to a claimant or generally to the

corporation, a court must look to the injury for which relief is sought and consider whether it is

peculiar and personal to the claimant or general and common to the corporation and creditors.'"

*In re Cabrini Med. Ctr.*, No. 09-14398, 2012 WL 2254386, at *7 (Bankr. S.D.N.Y. June 15,

2012) (quoting *Koch,* 831 F.3d at 1339), *aff'd,* 489 B.R. 7 (S.D.N.Y. 2012).  "A claim is general

'if [there is] . . . no particularized injury arising from it, and [it] could be brought by any creditor

of the debtor . . . .'"  *Cabrini*, 489 B.R. at 17 (quoting *St. Paul Fire & Marine Ins. Co. v.*

*PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)).  "A claim is personal to the creditor '[w]hen a

third party has injured not the bankrupt corporation itself but a creditor of that corporation . . . .'"

*Id.* (quoting *Picard*, 460 B.R. at 89).  "The injury cannot be 'a secondary effect from the harm

done to [the corporation].'"  *Cabrini,* 2012 WL 2254386, at *7 (quoting *St. Paul,* 884 F.2d at

704).  Here, the Court must look at the specific injury asserted as the basis of QBPL's veil-

piercing claims to determine whether the causes of action, as alleged, accrue individually to

QBPL.

Under New York law, "a court may pierce the corporate veil and find an individual liable

for the debts of the corporation 'where 1) the owner exercised complete domination over the

corporation with respect to the transaction at issue, and 2) such domination was used to commit a

fraud or wrong that injured the party seeking to pierce the veil.'"  *Fin. One, Inc. v. Timeless*

*Apparel, Inc.*, No. 09 Civ. 9397, 2011 WL 1345030, at *4 (S.D.N.Y. Mar. 29, 2011) (quoting

*MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC,* 268 F.3d 58, 63 (2d Cir.2001)).

The N.Y. Court of Appeals has explained the rule as follows:

> While complete domination of the corporation is the key to piercing the corporate
> veil, especially when the owners use the corporation as a mere device to further
> their personal rather than the corporate business, such domination, standing alone,
> is not enough; some showing of a wrongful or unjust act *toward plaintiff* is
> required.  The party seeking to pierce the corporate veil must establish that the
> owners, through their domination, abused the privilege of doing business in the
> corporate form to perpetrate a wrong or injustice *against that party* such that a
> court in equity will intervene.

*Morris v. New York State Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1161 (N.Y. 1993)

(citations omitted) (emphasis added); *see also Thrift Drug, Inc. v. Universal Prescription*

*Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997).

Under this rule, any claim asserted by QBPL against Kopf based on piercing the

corporate veil or alter ego liability must allege that Kopf used his control over JMK to commit a

wrongful or unjust act specifically directed to QBPL.  In evaluating the proper plaintiff to bring

that claim, the Court must look at the wrongful actions allegedly committed by Kopf.  If those

actions harmed JMK generally, and QBPL and others suffered injury as a result, then the trustee

would be the only proper party to assert the veil-piercing action.  But if Kopf's wrongful actions

were directed to QBPL, and caused particularized injury to QBPL, then QBPL has standing to

bring the action.  *See Pergament v. Yerushalmi (In re Yerushalmi)*, 487 B.R. 98, 105 (Bankr.

E.D.N.Y. 2012) (stating that the trustee is the proper party to assert the claim "(a) if the alter ego

claim could have been asserted by the Debtor pre-petition, *and* (b) if the claim does not involve a

direct injury to a particular creditor") (citing *St. Paul*, 884 F.2d at 704–05).

Judge Gropper's analysis in *Cabrini*, affirmed by the district court, is instructive.  *See*

*Cabrini*, 2012 WL 2254386, at *7–9.  In *Cabrini*, certain creditors of the debtor sought relief

from the automatic stay to name the debtor as a defendant in state court litigation against an

entity referred to as the N.Y. Missionary Sisters, which allegedly controlled the debtor.  *Id.* at *1.

The N.Y. Missionary Sisters opposed the relief, claiming that any alter ego claims against it

belonged to the estate and had either been released or were barred by the plan injunction.  *Id.* at

*6.  Judge Gropper began his analysis by looking to the underlying state court complaint to see if

the creditors asserted causes of action that were particular to them and whether any recovery on

their alter ego theory would not inure to the benefit of other creditors.  *Id.* at *8.  The court found

that the creditors had not alleged that the N.Y. Missionary Sisters "wronged them directly rather than by virtue of their alleged control of [the debtor]," or that the N.Y. Missionary Sisters had "directly converted the funds" belonging to the creditors.  *Id.*  Judge Gropper therefore held that the creditors lacked particularized claims for alter ego liability and were barred from bringing those claims, which belonged to the estate.  *Id.* at *7–9.

      While Judge Gropper's analysis is instructive, the facts of this case appear distinguishable.  Here, the alter ego claims asserted by QBPL allege, albeit in conclusory fashion, direct injury to QBPL, distinct from any general harm to other creditors.  By alleging that any actions taken by JMK were actually actions taken by Kopf, QBPL seeks to hold Kopf liable for its underlying claims against JMK—breach of contract, conversion, fraud and unjust enrichment—each of which *conceivably* represent a direct injury to QBPL, and could not have been brought by the Liquidating Trustee.  For example, in paragraph 156 of the Third-Party Complaint, QBPL alleges:

> Kopf's actions, which were perpetrated through Debtor, caused QBPL significant damages, including but not limited to damages from:  (1) the unperformed work that was alleged to have been performed under the Agreements; (2) the subpar and non-workmanlike quality of the work that was performed under the Agreements; (3) the fines imposed upon QBPL under the New York City building code due to Kopf/Debtor's breach of the Agreements; and (4) the loss of funds caused by Kopf/Debtor's misappropriation and/or conversion of funds held by and/or under the control of Kopf/Debtor.

(Third-Party Compl. ¶ 156.)

      These allegations describe direct, particularized harm to QBPL, and create standing for QBPL to bring the claims, even though QBPL fails to plead Kopf's personal actions that caused that harm.  To illustrate, QBPL's alter ego claim based on conversion seeks to hold Kopf liable not for his own conversion of funds entrusted to JMK, but for JMK's alleged conversion of funds.  Where a creditor seeks to assert an alter ego claim against a corporation's principal based

on that principal's conversion of corporate assets, the harm is general—funds taken from the corporation, to the detriment of all creditors—and the claim (unless it was settled and released as occurred here as part of the confirmed Plan) belongs solely to the trustee.[7]  *See, e.g., Gosconcert*, 158 B.R. at 28–29.  But here, QBPL alleges that JMK converted funds belonging to QBPL, and seeks to hold Kopf liable for that conversion because Kopf used his total control over JMK to cause JMK to convert the funds.[8]  Similarly, at least some breach of contract claims against JMK assert particular harm to QBPL, e.g., QBPL's claims for damages based on the imposition of fines under the building code.  QBPL has standing to bring those claims, despite QBPL's failure to plead the wrongful acts by Kopf directed at QBPL that resulted in this injury.  But other breach of contract claims, e.g., claims for damages due to general lack of performance by JMK as to all of its contracts, do not allege particular harms and do not create standing.  *See id.* at 29.

The Court finds that QBPL has standing to bring the claims for alter ego liability and piercing the corporate veil seeking to hold Kopf liable for JMK's debts for injuries particular to QBPL.  For those claims to be successful, QBPL must plead and prove that Kopf used his control of JMK to commit the acts that caused the injuries particular to QBPL.  Thus, even though QBPL may have standing to assert the alter ego claims, to survive a motion to dismiss, the Third-Party Complaint must make at least "some showing of a wrongful or unjust act [by Kopf] toward" QBPL.  *See Morris*, 623 N.E.2d at 1161.  As the Court will discuss in depth

---

[7]     Paragraph 76 of the Third-Party Complaint alleges that "[u]pon information and belief, Kopf used his domination and control over Debtor to *perpetrate his wrongful acts on Debtors' customers* while protecting his own personal assets and for his personal gain at the expense of QBPL."  (Emphasis added.)  This allegation is consistent with a claim by a trustee for generalized harm injuring all creditors, and not a direct claim by QBPL.

[8]     Paragraphs 69 and 70 of the Third-Party Complaint allege that Kopf transferred funds from the Debtor "which funds were to be used for the purpose of paying subcontractors for work performed on the JMK Projects . . . ."  As explained in Section II.B.1.a., *infra*, QBPL lacks standing to bring claims to recover funds that QBPL paid to JMK that should have been used to pay subcontractors.

below, the Court holds that QBPL has failed to comply with the federal pleading standards and

has failed state a plausible claim for piercing the corporate veil and alter ego liability.

    2.  *Failure to State a Claim*

      a.  <u>To Survive a Motion to Dismiss, a Cause of Action Must Allege Sufficient</u>
         <u>Facts to State a Plausible Claim for Relief</u>

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a

claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  Rule 8(a)(2) requires a

complaint to contain "a short and plain statement of the claim showing that the pleader is entitled

to relief." FED. R. CIV. P. 8(a)(2).  To survive a motion to dismiss pursuant to Rule 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.

v. Twombly*, 550 U.S. 544, 570 (2007)).  Bankruptcy Rule 7012 makes Rule 12(b)(6) applicable

to adversary proceedings.

Courts deciding motions to dismiss must accept all factual allegations as true and draw all

reasonable inferences in favor of the non-moving party.  *See Hilaturas Miel, S.L. v. Republic of

Iraq*, 573 F. Supp. 2d 781, 797 (S.D.N.Y. 2008).  The Court must limit its review to facts and

allegations contained in (1) the complaint, (2) documents either incorporated into the complaint

by reference or attached as exhibits, and (3) matters of which the court may take judicial notice.

*See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369

F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Courts may also consider documents not attached to the complaint or incorporated by reference,

but "upon which the complaint *solely* relies and which *[are] integral to the complaint*." *Roth v.

Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks omitted; emphasis in

original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)); *see

*also Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931(RJS), 2009 WL 928280, at *4 (S.D.N.Y. Mar. 30,

2009); *Grubin v. Rattet (In re Food Mgmt. Grp.)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008)

(concluding that court may consider documents that have "not been incorporated by reference

where the complaint relies heavily upon its terms and effect, which renders the document

integral to the complaint") (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, the Court's objective is not to determine whether

the claimant will succeed in her claim, but instead whether the claimant is entitled to support her

claim by offering evidence. *Hilaturas,* 573 F. Supp. 2d at 797. Following the Supreme Court's

decision in *Ashcroft v. Iqbal*, courts use a two-prong approach when considering a motion to

dismiss. *See, e.g.*, *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL

3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (acknowledging a "two-pronged" approach to deciding

motions to dismiss); *S. Ill. Laborers' and Emp'rs Health and Welfare Fund v. Pfizer, Inc.*,

No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (same); *Inst. for*

*Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, No. 08 Civ.

6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (same). First, the court must

accept all factual allegations in the complaint as true, discounting legal conclusions clothed in

factual garb. *See Iqbal*, 556 U.S. at 678; *Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008).

Second, the court must determine if these well-pleaded factual allegations state a "plausible

claim for relief." *Iqbal*, 556 U.S. at 679.

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.* A

claim is plausible when the factual allegations permit "the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at

556).  Meeting the plausibility standard requires a complaint to plead facts that show "more than

a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

A complaint that only pleads facts that are "merely consistent with a defendant's liability" does

not meet the plausibility requirement.  *Id.* (internal quotation marks omitted).  "A pleading that

offers labels and conclusions or a formulaic recitation of the elements of a cause of action will

not do."  *Id.* (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550

U.S. at 555).

> b.  QBPL Failed to State Plausible Claims for Relief for Piercing the Corporate
>     Veil and Alter Ego Liability

Under New York law, whether to pierce the corporate veil is a fact specific inquiry and

cannot be reduced to a definitive rule.  *Morris*, 623 N.E.2d at 1160–61.  "Generally, however,

piercing the corporate veil requires a showing that:  (1) the owners exercised complete

domination of the corporation in respect to the transaction attacked; and (2) that such domination

was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."

*Id.*  As to the first prong of this test, New York courts consider multiple factors in determining

whether domination and control of the corporation existed, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3)
> intermingling of funds; (4) overlap in ownership, officers, directors, and
> personnel; (5) common office space, address and telephone numbers of corporate
> entities; (6) the degree of discretion shown by the allegedly dominated
> corporation; (7) whether the dealings between the entities are at arms length; (8)
> whether the corporations are treated as independent profit centers; (9) payment or
> guarantee of the corporation's debts by the dominating entity, and (10)
> intermingling of property between the entities.

*Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1053 (2d Cir.1997).

QBPL made broad assertions about Kopf's alleged control of JMK.  For example, QBPL states that "Kopf exercised unchecked domination and control over [JMK] through his role as President and sole shareholder, including but not limited to making decisions with respect to the transfer of funds between [JMK] and himself and determining how [JMK] would allocate funds under its control or otherwise in its possession."  (Third-Party Compl. ¶ 74.)  The Third-Party Complaint also alleges that "[u]pon information and belief, [JMK] failed to observe proper corporate formalities and completely disregarded its corporate identity, including but not limited to the intermingling of [JMK]'s funds and Kopf's personal funds, such that [JMK] had no identity separate from that of Kopf, its President and sole shareholder."  (*Id.* ¶ 75.)

These statements rise only slightly above the level of ritual incantation of domination and control by Kopf, if at all.  Kopf's ownership of JMK, standing alone, is not enough to satisfy the domination component of an alter ego claim.  *See Bellomo v. Pennsylvania Life Co.*, 488 F. Supp. 744, 745 (S.D.N.Y. 1980) ("Control through 100% stock ownership does not in itself constitute a subsidiary the alter ego of the parent.").  QBPL must show that Kopf actually exercised control over JMK, specifically with respect to the QBPL Contracts or QBPL's funds. *See Network Enters., Inc. v. Reality Racing, Inc.*, No. 09 Civ. 4664, 2010 WL 3529237, at *5 (S.D.N.Y. Aug. 24, 2010) ("The Court considers not whether Defendants exhibited behavior at any time that might indicate domination and control, but whether they exhibited such behavior with respect to the transaction at issue." (internal quotation marks omitted)).  Asserting generally that Kopf committed wrongful acts directed against QBPL by "intermingling of Debtor's funds and Kopf's personal funds" is not enough.  This allegation might help support a claim by JMK against Kopf for wrongfully diverting corporate property, but it does not establish a direct claim by QBPL against Kopf.  Therefore, the Court seriously doubts whether the facts alleged in the

Third-Party Complaint are sufficient to allow it to reasonably infer that Kopf exercised complete

domination over JMK in relation to QBPL. *See Iqbal*, 556 U.S. at 678; *see also Network Enters.*,

2010 WL 3529237, at *6 (dismissing veil piercing claim because "there [was] nothing in the

complaint to indicate that Defendants exercised any more control over [the corporation] than

would be expected of the directors or shareholders of any corporation").

But the Court need not rely on the domination component of New York's veil-piercing

test alone. Even if the Court assumes that QBPL sufficiently established Kopf's domination of

JMK as to the transactions at issue, the Third-Party Complaint falls well short of alleging facts to

allow the Court to reasonably infer that Kopf used his control over JMK to commit a fraud or

other wrong that resulted in loss or injury to QBPL. *See Freeman*, 119 F.3d at 1053; *Morris*, 623

N.E.2d at 1161. For example, the Third-Party Complaint alleges:

> Kopf used his domination and control over [JMK] to perpetrate his wrongful and
> other inequitable acts on [JMK's] customers while protecting his own personal
> assets and for his own personal gain at the expense of QBPL. Kopf's actions in
> this respect included, but were not limited to, using [JMK] to misrepresent that
> certain work had been performed, the workmanship and quality with respect to
> the work that had been performed, the manner in which the Debtor used funds
> remitted to or otherwise placed under its control for subcontractor payment for
> QBPL, and [JMK's] compliance with the terms of the Agreements.

(Third Party Compl. ¶ 76.)

These allegations are the types of "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements," that are insufficient to survive a motion to

dismiss. *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 555). Absent from the Third-Party

Complaint are any facts or allegations relating to specific acts committed by Kopf himself which

caused harm to QBPL—as opposed to actions taken by JMK.[9] There are no allegations that

---

[9] The only allegation made in the Complaint that could be construed as satisfying this requirement is the
vague statement that "[i]n October 2010, Kopf was involved in further deception of QBPL, directing his attorney to
talk with QBPL about new work for [JMK]." (Third-Party Compl. ¶ 87.) This allegation relates to postpetition

Kopf himself misrepresented to QBPL that certain work had been performed or that subcontractors had been properly paid.[10] To be sure, QBPL "need not include 'heightened fact pleading of specifics' to survive a Rule 12(b)(6) motion, but the '[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true.'" *Network Enters.*, 2010 WL 3529237, at * 3 (quoting *Twombley*, 550 U.S. at 555, 570). "[T]his standard 'demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Id.* (quoting *Iqbal,* 556 U.S. at 678). The Court finds the Third-Party Complaint lacking in this regard. Therefore, QBPL has failed to sufficiently state plausible claims for relief based on piecing the corporate veil and alter ago liability. Counts X and XI of the Third-Party Complaint are dismissed without prejudice, and the Court grants QBPL leave to amend.

## B.  QBPL's Conversion and Unjust Enrichment Claims

### 1.  *Standing*

#### a.  QBPL Lacks Standing to Bring Actions to Recover N.Y. Lien Law Article 3–A Trust Funds

As with QBPL's claims for piercing the corporate veil and alter ego liability, the Court must begin again by deciding whether QBPL has standing to assert the conversion and unjust enrichment claims. Kopf argues that QBPL lacks standing to bring a conversion claim based on the funds in question because money paid to JMK for services rendered by subcontractors was

---

conduct trying to persuade QBPL to allow JMK to continue to perform under the Contracts. It has nothing to do with any prepetition causes of action alleged in the Third-Party Complaint.

[10]     The only specific allegations about JMK's misrepresentations to QBPL are contained in paragraph 85 of the Third-Party Complaint, referring to a postpetition meeting on August 24, 2010, at which two JMK employees, John Romero and Dan Hubert, allegedly represented that the bankruptcy would have no effect on the work Debtor was required to perform under the Contracts. The Debtor's postpetition work is not the basis for the claims against Kopf.

"trust fund" money under New York Lien Law §§ 70–79a ("Article 3–A"), and thus can only be recovered by the beneficiaries of the trust—the subcontractors.

"Article 3–A is a New York State statute designed to protect subcontractors, tax collectors, and parties who expend labor or extend financing in construction projects, by impressing with a trust any funds paid to a contractor or received by an owner in connection with an improvement of real property in the state." *Interworks Sys., Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 695 (2d Cir. 2010). "An Article 3–A trust arises automatically by operation of law when fees are paid to the contractor or received by the owner in connection with an improvement of real property." *Id.* (citing N.Y. Lien Law § 71(5)). Only beneficiaries of an Article 3–A trust may sue to enforce the trust. N.Y. Lien Law § 77(1). QBPL, as project owner, is not a beneficiary of the trust and therefore lacks standing to bring an action for the return of trust funds. *See id.* §§ 71(2), 77; *see also Broadway Houston Mack Dev. LLC v. Kohl*, 870 N.Y.S.2d 748, 754 (N.Y. Sup. Ct. 2008) (stating that "[a]n owner is not a beneficiary enumerated under Lien law § 71(2)" and, absent subrogation, is not entitled to recover trust funds), *aff'd*, 897 N.Y.S.2d 505 (N.Y. App. Div. 2010).

QBPL argues that Article 3–A does not protect money paid over to JMK because the work QBPL paid for was never completed. This assertion is incorrect; an Article 3–A trust "arises automatically" the moment funds are paid over. *Interworks*, 604 F.3d at 695. Further, "[a]s a matter of statutory construction and under [New York] precedents, even before funds are 'due or earned,' they become assets of an Article 3–A trust." *RLI Ins. Co. v. New York State Dep't of Labor*, 766 N.E.2d 934, 938 (N.Y. 2002). Therefore, the moment QBPL gave money to

JMK for payment to subcontractors, that money became part of an Article 3–A trust fund, and

QBPL, as owner, lacks standing to bring suit to recover those funds.[11]

The Court notes, however, that only funds given to JMK for the purpose of paying

subcontractors became Article 3–A trust money.  To the extent QBPL paid JMK directly for

services rendered by JMK (e.g., in the Pass-Through Contracts), that money was not Article 3–A

trust fund money, and QBPL would have standing to bring a claim against Kopf for conversion

of those funds.  But as the Court will discuss more fully below, QBPL has failed to specifically

identify which funds it seeks to recover—a fatal flaw in QBPL's conversion claim pleading—

making it impossible for the Court to determine at this time whether it has standing to bring the

conversion claim at all.  Therefore, the Court cannot rule at this time whether Article 3–A

deprives QBPL completely of standing to bring a conversion claim against Kopf.  But if QBPL

amends the Third-Party Complaint to assert a conversion claim with sufficient particularity, its

ability to bring that claim will be limited to those funds paid for the benefit of JMK rather than

subcontractors.

      b.   <u>QBPL Has Standing to Assert Claims for Conversion and Unjust Enrichment
of Funds Paid for the Benefit of JMK Because They Allege a Direct,
Particularized Harm</u>

Kopf also argues that QBPL lacks standing to bring claims for conversion and unjust

enrichment because these claims allege general harm and belong to the estate.  Kopf asks the

Court to look to the substance of the claims, rather than the labels QBPL places on them.  He

---

[11]     This rule is not inherently inequitable; while an owner may not bring suit to recover Article 3–A trust funds, unpaid subcontractors also cannot enforce mechanic's liens against the owner's property, to the extent the owner paid the general contractor.  "It is well settled that the rights of a subcontractor are derivative of the rights of the general contractor and that a subcontractor's lien 'must be satisfied out of funds due and owing from the owner to the general contractor' at the time the lien is filed." *104 Contractors, Inc. v. R.T. Golf Assocs., L.P.*, 705 N.Y.S.2d 752, 754 (N.Y. App. Div. 2000) (quoting *DiVeronica Bros. v. Basset*, 624 N.Y.S.2d 296, 297 (N.Y. App. Div. 1995)).  Thus, "[u]nder New York law, a subcontractor must establish that there is money due to a general contractor from an owner based on a primary contract, for the subcontractor to recover under a mechanic's lien against the owner." *Rure Assocs., Inc. v. DiNardi Const. Corp.*, 917 F.2d 1332, 1335 (2d Cir. 1990).

asserts that doing so would reveal that these claims are actually fraudulent conveyance claims

belonging to the JMK estate.  The Court, however, looks at the claims as QBPL pleads them.

*1031 Tax Grp.*, 397 B.R. at 679.  By its very definition, a claim for conversion requires the

claimant to establish a "superior right of possession" to the allegedly converted funds.  *Meese v.

Miller*, 436 N.Y.S.2d 496, 500 (N.Y. App. Div. 1981) (citation omitted).  Similarly, a claim for

unjust enrichment must "allege that defendant received something of value which belongs to the

plaintiff."  *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004)

(citations and quotation omitted).  These claims, if sufficiently pled, would establish a direct,

particular harm to QBPL.  Therefore, QBPL is not barred by the plan injunction and release from

bringing claims for conversion and unjust enrichment; QBPL has standing to bring these claims.

### 2.  *Failure to State a Claim*

#### a.  QBPL Failed to State a Plausible Claim for Conversion

Kopf argues that QBPL's conversion claim should be dismissed for failure to state a

claim because (1) QBPL did not sufficiently plead the acts that constituted the conversion; (2)

QBPL made no demand for the return of the funds; (3) QBPL's claim is actually contractual in

nature; and (4) QBPL failed to specifically identify the funds allegedly converted by Kopf.  The

Court agrees with Kopf only as to the last of these arguments.

"According to New York law, '[c]onversion is the unauthorized assumption and exercise

of the right of ownership over goods belonging to another to the exclusion of the owner's

rights.'"  *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting

*Vigilant Ins. Co. of Am. v. Hous. Auth.,* 660 N.E.2d 1121, 1126 (N.Y. 1995)).

> To withstand a motion to dismiss in a conversion claim, a plaintiff must allege:
> "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff
> had ownership, possession or control over the property before its conversion; and

(3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights."

*Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009) (quoting *Moses v. Martin,* 360

F. Supp. 2d 533, 541 (S.D.N.Y. 2004)).

Contrary to Kopf's arguments, at this stage of the proceedings, QBPL is not required to

state exactly the acts committed by Kopf that constituted conversion.  Rather, it is enough to

plead "sufficient facts to establish a plausible inference that [Kopf] played some role in the

conversion."  *Segal v. Bitar*, No. 11-4521, 2012 WL 273609, at *9 (S.D.N.Y. Jan. 30, 2012)

(quotations omitted).  Here, the fact that Kopf was the controlling member of JMK is enough to

satisfy this burden.

Additionally, the Court rejects Kopf's argument that QBPL was required to make a

demand for the return of the funds before bringing its conversion claim.  "New York law does

not . . . always require that a demand be made and be met by a refusal to make out a claim of

conversion.  Instead, a demand is necessary only where the property is held lawfully by the

defendant."  *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d

Cir. 1996).  "[W]here the defendant holds the property unlawfully—where, for example, he stole

the property—no demand and refusal are necessary to render the defendant liable."  *Id.* (internal

quotation marks omitted).  Insofar as QBPL asserts a claim for conversion against Kopf for funds

it paid over to JMK, Kopf had no lawful right to possess *any* JMK funds and therefore no

demand was required.

The Court also disagrees with Kopf that QBPL's claim is essentially contractual and is

therefore not proper as a conversion claim.  New York case law is clear that "an action for

conversion cannot be validly maintained where damages are merely being sought for breach of

contract."  *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 452 N.Y.S.2d 599, 600 (N.Y. App. Div.

1982).  Thus, "[a] plaintiff must allege acts that are unlawful or wrongful, rather than mere violations of contractual rights, to state a claim for conversion."  *Calcutti v. SBU, Inc.*, 223 F. Supp. 2d 517, 523 (S.D.N.Y. 2002).  But QBPL's claims against Kopf cannot possibly be contractual—there was never any contract between Kopf and QBPL.  Because QBPL alleges that Kopf unlawfully took funds from JMK, it is entitled to bring a conversion claim against Kopf.

The Court agrees, however, that QBPL has failed to state a plausible claim for relief for conversion because it has not specifically identified the funds allegedly converted by Kopf.  "[I]t is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question."  *Id.* (internal citations and quotations omitted).  "If the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel, such as when a customer of a bank deposits funds into an account at the bank, it is not the proper subject of a conversion action."  *Id.* (internal citations and quotations omitted); *see also T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-2843, 2010 WL 4038826, at *7 (E.D.N.Y. Oct. 14, 2010) ("Under New York law, 'money can be the subject of a conversion action when it can be identified and segregated as a chattel can be.'" (quoting *Payne v. White*, 477 N.Y.S.2d 456, 458 (N.Y. App. Div. 1984))).

In the Third-Party Complaint, QBPL seeks damages for conversion "in an amount not less than $423,963.21."  (Third-Party Compl. at 44.)  Nowhere in the Third-Party Complaint does QBPL identify specific funds converted by Kopf, or explain which funds Kopf converted out of the more than $10 million QBPL paid to JMK.  As explained above, a claim for conversion of money will fail where the money is not "specifically identifiable and segregated."  *Mfrs. Hanover Trust Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (N.Y. App. Div. 1990); *see also*

*Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C.,* 288 F. Supp. 2d 473, 480 (S.D.N.Y. 2003) (dismissing cause of action for conversion where "complaint merely refer[red] to unspecified monies and assets . . . in an amount in excess of $75,000" and where there was "no indication of an identifiable fund or otherwise segregated amount, nor . . . any description of the alleged transfer or transfers from which the Court could infer a specifically identified fund of money"). QBPL has failed to satisfy its burden of specifically identifying the funds in question and has therefore failed to state a plausible claim for conversion.

QBPL's reliance on the Second Circuit's decision affirming the Air China Judgment rendered against Kopf is misplaced. *See Air China, Ltd. v. Kopf*, 473 F. App'x 45 (2d Cir. 2012). QBPL relies on *Air China* for the proposition that the fact that it turned over funds to corporate defendant JMK for a specific purpose is enough to support its conversion claim, with no requirement for specific identification. This is not an accurate reading of the *Air China* holding. The Second Circuit held in *Air China* that "New York law supports the view that where money is turned over by a plaintiff to a corporate defendant to be used for a specific purpose for the benefit of the plaintiff, but is not used for that purpose, an action for conversion may be maintained against the converters." *Air China*, 473 F. App'x at 50 (internal quotation marks omitted). But holding that those facts would support a claim for conversion does not dispense with a plaintiff's requirement to plead conversion of specific funds. The *Air China* court was not addressing the standards for a conversion claim at all; it was merely explaining that a conversion action may be brought against corporate officers and agents who commit conversion.

For these reasons, QBPL has failed to state a claim for conversion. Therefore, Count VI of the Third-Party Complaint is dismissed without prejudice, with leave to amend to supply the required specificity.[12]

    b.  <u>QBPL Failed to State a Plausible Claim for Unjust Enrichment</u>

Count IX of the Third-Party Complaint asserts a claim against Kopf for unjust enrichment. Under New York law,

> [a]n unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. Thus, in order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.

*Georgia Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotations omitted). "A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff." *Bazak*, 347 F. Supp. 2d at 4 (citations and quotation omitted). For the same reasons discussed in connection with QBPL's conversion claim, the Court finds that QBPL has inadequately stated a plausible claim for unjust enrichment. "The essence of a claim for unjust enrichment is that one party has parted with money or a benefit that has been received by another at the expense of the first party." *Id*. (citation omitted). Because QBPL did not identify which funds Kopf allegedly took from JMK, QBPL has not provided the Court with sufficient facts to reasonably infer that Kopf received something that belonged to QBPL. Therefore, Count IX is dismissed without prejudice, and QBPL is granted leave to amend.

---

[12]    Additionally, as the Court already discussed, to the extent funds QBPL paid to JMK became part of an Article 3–A trust fund, QBPL would have no superior right to those funds and a claim for conversion of those funds would fail for that reason as well. *See Meese*, 436 N.Y.S.2d at 500 (stating that claim for conversion requires a superior right to the funds in question).

### III.    CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** the Motion.  Counts VI, IX, X, and

XI of the Complaint are **DISMISSED** without prejudice, and the Court grants QBPL leave to

amend within thirty (30) days from the date of this Order.

**IT IS SO ORDERED.**

Dated:  December 20, 2013
         New York, New York

                                        _____*Martin Glenn*_____
                                               MARTIN GLENN
                                        United States Bankruptcy Judge